González, Demandante y Apelante, *v.* The Fajardo Development Company, Demandada y Apelada.

Apelación procedente de la Corte de Distrito de Humacao en pleito sobre daños y perjuicios.

No. 2475.—Resuelto en marzo 9, 1922.

Daños y Perjuicios — *Employer's Liability Act* — Comercio entre Estados — Negligencia de Porteadores Públicos.—La ley federal sobre responsabilidad de patronos, conocida por ''Employer's Liability Act,'' es de aplicación en Puerto Rico a un caso de daños y perjuicios originado en marzo 16, 1916 a virtud de la muerte de un empleado de ferrocarril público a causa de la negligencia de una corporación ferrocarrilera, aun cuando el perjudicado ni la corporación realizaran actos de comercio entre Estados al ocurrir el accidente.

Id.—Responsabilidad del Patrono—Deber del Empleado.—El hecho de que un guarda-agujas que estaba dando salida a un tren de vagones abandone su puesto y huya al ver que uno de ellos se había descarrilado y en la huída

fuera alcanzado y muerto por el vagón descarrilado, no es motivo para decidir que la víctima no estaba en el cumplimiento de sus deberes al ocurrir el accidente.

Id.—Negligencia Contributoria.—Un empleado, ya sea menor o adulto, que sin culpa por su parte se ve colocado por su patrono en situación de peligro, no es responsable de negligencia contributoria por el hecho de no decidir rápidamente y actuar en la forma más sabia para escapar del peligro que le amenazaba.

Id.—Filiación—Derecho del Padre a Reclamar por la Muerte de su Hijo a causa de Negligencia.—Evidencia de la existencia de un pleito de filiación entablado por una supuesta hija natural de la persona que falleció a consecuencia de la negligencia de la demandada, y de otro pleito en que aquélla reclama daños y perjuicios de ésta a causa de la muerte del supuesto padre, terminados ambos pleitos por sentencias firmes declarando desistidas las demandas, no puede privar al padre legítimo de la víctima de su derecho a reclamar daños y perjuicios por la muerte de su hijo.

Id.—Parte Demandante—Prueba de su Personalidad.—La declaración no contradicha del padre demandante en cuanto a que la víctima era su hijo legítimo, y la certificación del matrimonio del padre con la madre de su hijo, prueban suficientemente su derecho a establecer este pleito, sin que sea necesario presentar la certificación del nacimiento del hijo.

Id.—Sentencia—Cuantía de los Daños y Perjuicios.—Al dictar sentencia concediendo daños y perjuicios a un padre por la muerte de un hijo al amparo de la ley federal conocida por "Employer's Liability Act," deberán tenerse en cuenta las pérdidas y daños pecuniarios realmente sufridos por el padre.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. A. Aponte, Jr.*

Abogado de la apelada: *Sr. L. Muñoz Morales.*

El Juez Presidente Sr. del Toro, emitió la opinión del tribunal.

El 16 de marzo de 1916 murió, destrozado por un vagón del ferrocarril de la demandada, Santiago Medina, soltero, de veintitrés años de edad, empleado como guarda-agujas en el dicho ferrocarril.

Antonio González, nombrado por la corte administrador de los bienes del finado, basándose en que la muerte se debió a la negligencia de la demandada, inició este pleito en beneficio de Antonio Medina, padre legítimo de Santiago, reclamando la suma de $19,240.

Contestó la demandada. Fué el pleito a juicio y finalmente la corte dictó sentencia declarando la demanda sin lugar. Apeló el demandante y señaló en su alegato la comi-

sión de tres errores, a saber: 1, al decidirse que la Ley del Congreso conocida por "Employer's Liability Act" no era aplicable; 2, al resolverse que el finado no actuaba en el curso de su empleo al ocurrir el accidente, y 3, al no declararse con lugar la demanda fijando la indemnización correspondiente.

Procederemos a la consideración de los errores en el orden en que han sido señalados.

1. Es un hecho admitido que la demandada en este caso es una corporación dedicada como porteador público a la explotación del ferrocarril que existe entre Mameyes y Naguabo, en la parte Oriental de Puerto Rico. Es también otro hecho admitido que Santiago Medina era empleado de la demandada y actuaba como tal el día en que ocurrió el accidente. La acción se entabla por el administrador judicial de los bienes del finado a beneficio de su legítimo heredero. Este dependía de Medina para su subsistencia. El accidente ocurrió el 16 de marzo de 1916, o sea con anterioridad a la vigencia del Acta Jones.

Para concluir que la Ley Federal invocada era aplicable en Puerto Rico a la fecha en que ocurrió el accidente, basta hacer referencia a los casos de *American Railroad Company* v. *Didricksen*, 227 U. S. 145, 148, y *American Railroad Company* v. *Birch*, 224 U. S. 547.

La corte sentenciadora admite que lo era pero sostiene que "ni la corporación demandada, ni su empleado Santiago Medina llevaban a cabo, al ocurrir el accidente, actos de comercio entre Estados, que permita el ejercicio de la acción de acuerdo con la Ley del Congreso de los Estados Unidos, sobre responsabilidad de patronos (Employer's Liability Act), aprobada en 1908."

El error de la corte es claro. Sin duda su atención estuvo fija en la sección primera de la ley que es la que habla de "todo porteador público por ferrocarril mientras esté dedicándose al comercio entre cualquiera de los varios Es-

tados y Territorios   *   *   * ."   La sección segunda no habla de comercio entre Estados y es la directamente aplicable. Dice así:

"Sección 2.—Que todo porteador público por ferrocarril en los Territorios, el Distrito de Columbia, la Zona de Panamá u otras posesiones de los Estados Unidos, será responsable de daños y perjuicios para con cualquier persona que resultare lesionada mientras esté empleada por tal porteador en cualquiera de dichas jurisdicciones, o, en caso de muerte de tal empleado, para con sus 'representantes personales' en beneficio de la viuda o esposo sobreviviente e hijos de tal empleado; y si no los hubiere, entonces de los padres de tal empleado; y si no los hubiere, entonces del pariente más próximo que dependa de tal empleado, siempre que la lesión o muerte resulte en todo o en parte de la negligencia de cualquiera de los funcionarios, agentes o empleados de tal porteador, o por razón de cualquier defecto o insuficiencia debido a su negligencia, en sus carros, máquinas, vías, terraplenes, obras, embarcaciones, muelles, u otro equipo."

2. En su opinión la corte sentenciadora se expresó como sigue:

"El demandante sostiene en la alegación novena de su demanda, que la muerte del expresado Santiago Medina se debió al estado defectuoso, insuficiente e inseguro de las vías de la corporación demandada.   La contención de la parte demandada es que el accidente resulta inexplicable, toda vez que las vías en cuestión estaban buenas y bueno también el vagón que fué objeto del descarrilamiento. Ciertamente que la prueba en relación con la causa del accidente es bastante contradictoria; pero la preponderancia de la evidencia nos induce a creer que las vías en cuestión estaban defectuosas, pues no de otra suerte hubiera ocurrido el accidente que ha dado origen a esta demanda.   De igual modo entendemos que fué negligente la corporación demandada, toda vez que permitió que los vagones cargados de cañas fueran soltados por las vías cuesta abajo, sin máquina en su delantera, y sin medio alguno de controlar el impulso con que marchaban los expresados vagones por la pendiente.

"Ahora bien; para que la corporación demandada sea responsable de la muerte de Santiago Medina no basta establecer que dicha corporación fué negligente en la construcción de sus vías y en el

manejo y conducción de sus trenes sino que es necesario de igual modo probar que tal negligencia fué la causa inmediata de la muerte. Y por lo que hace a este extremo fundamental del litigio, somos de opinión que la prueba del demandante (no) sostiene sus alegaciones. En efecto, en la demanda se alega, y es un hecho probado, que Santiago Medina desempeñaba las funciones de guarda-agujas, y sus obligaciones en el momento que ocurrió el accidente eran las de cambiar la aguja que empalmaba cierto desvío con la vía fija en los terrenos de la finca 'Oriente.' Para realizar ese cambio de agujas era menester actuar junto a la vía y por medio de una palanca hacer el empalme; y en el hecho octavo de la demanda se dice: 'que cumpliendo las órdenes de la compañía demandada, Santiago Medina hizo el cambio de agujas de referencia en la forma indicada, y que estando en esa operación y apenas comenzaron a pasar los vagones que debían tomar la vía general, uno de los vagones cargados se volcó en el sitio aludido y cogió debajo a Medina, ocasionándole la muerte instantáneamente.'

"La prueba no sostiene tal alegación. Lejos de eso, se ha establecido de una manera concluyente que el vagón descarriló mucho antes de llegar al sitio donde se encontraba Medina, y que Medina en vez de permanecer en su sitio, echó a correr delante del vagón, y éste le alcanzó y al volcarse le produjo la muerte. De suerte, pues, que Medina no estaba en el cumplimiento de sus deberes como empleado, cuando ocurrió el accidente que le privó de la vida. La prueba sostiene, además, que el vagón, no obstante su descarrilamiento, pasó frente a la palanca donde debió haber permanecido Medina y continuó corriendo un largo trecho, de modo que si Medina permanece quieto en el sitio donde tenía que cumplir las funciones de su empleo, no hubiera recibido lesión alguna. En tales circunstancias, la corte llega a la firme conclusión de que la causa próxima de la muerte de Santiago Medina no es atribuible a la corporación demandada."

Hemos examinado cuidadosamente toda la prueba practicada y a nuestro juicio no sólo demuestra como reconoció la corte de distrito la negligencia de la corporación demandada, sí que también que Santiago Medina murió en el curso de su empleo. Citaremos dos testigos, uno del demandante y otro de la demandada.

Patricio Navarro, testigo del demandante, se expresó así:

"Que es empleado de la demandada The Fajardo Development Company y lo era también en todo el mes de marzo de 1916. Que el empleo suyo consiste en ser maquinista de la locomotora No. 5. Que el día 16 de marzo de 1916 dicha locomotora estaba en operaciones y le ocurrió el accidente con Santiago Medina. Que ese día las maniobras que el testigo y los otros empleados de la central hicieron fueron las siguientes: entraron en el ramal de Oriente; empezaron a maniobrar y sacaron los vagones llenos que había y los metieron al otro desvío para dejar los vacíos, y entonces se pasaron al desvío donde estaban los vagones llenos de cañas, y Santiago Medina que estaba parado en la aguja, en eso un vagón * * *. Que en aquel momento Angel Velilla aflojó los frenos de los vagones para que éstos pasaran adelante. Que entonces vinieron los vagones y Santiago Medina estaba en la aguja. Que Velilla aflojó los frenos para que los vagones bajasen por la pendiente por su peso natural, y sucedió que pasaron dos vagones y esos pasaron bien, entonces pasó otro, pero venía descarrilado y Santiago Medina que estaba junto a la aguja parado, cuando vió que el vagón venía descarrilado, huyó corriendo para adelante * * *."

Y Angel Velilla, testigo de la demandada, dijo:

"Que el testigo cuando ocurrió el accidente estaba en los frenos de uno de los vagones, aflojando los frenos. Que el vagón después que se le aflojaron los frenos, pasó seguido y el muchacho Medina parece que se dió cuenta y trató de salvarse inmediatamente. Que trató de salvarse corriendo para adelante; pero el vagón lo alcanzó. Que si el testigo hubiese estado en la aguja ocupando el puesto de Medina y hubiera visto que el vagón se le iba encima como le ocurrió a Medina, el testigo no se hubiese quedado allí sino que hubiera corrido al igual que lo hizo Medina. Que si el testigo hubiera venido montado en el vagón que se descarriló, también se hubiera tirado para salvarse. Que allí donde ocurrió el accidente hay una pendiente pequeña. Que el impulso que esos vagones traían era bastante para hacer correr un vagón luego de descarrilado, fuera de la vía. Que el vagón descarrilado siguió corriendo fuera de la vía, un trecho largo sin volcarse hasta que se viró. Que ese vagón venía con bastante velocidad para seguir corriendo sobre sus ruedas por la tierra como unos treinta pies fuera del rail. Que el vagón que descarriló no fué el último; que el cuarto fué el que descarriló * * *; que Medina cuando pasó el primer vagón estaba en la

aguja donde tenía que estar para cuando pasaran todos los vagones cambiar la aguja de manera que la máquina pudiera salir entonces; que en ese sitio hay una media pendiente; que pasaron bien el primero y el segundo y el tercero, y mientras tanto Medina seguía en la aguja parado, y al pasar el cuarto vagón fué que descarriló. Que entonces se desconectaron los vagones al ocurrir el vuelco; que el vagón se descarriló un poco más acá de la aguja y pasó por frente de la aguja donde estaba Santiago Medina, pero siguió corriendo y lo cogió al volcar.''

Santiago Medina estaba en su puesto como guarda-agujas. Pasaron los primeros vagones lanzados en la forma negligente que se ha indicado sin que nada ocurriera. Medina permaneció en su puesto. El tercer vagón, según Navarro, o el cuarto, según Velilla, se descarriló, y al verlo venir encima, Medina huyó pendiente abajo, pero el vagón lo alcanzó y al volcarse le ocasionó la muerte. Se pretende que por el hecho de haber Medina corrido y haber ocurrido su muerte mientras corría, el accidente tuvo lugar cuando Medina no estaba en el curso de su empleo. Es cierto que la prueba tiende a demostrar que aunque el vagón descarriló más arriba de la aguja, se volcó más abajo, y que si Medina hubiera permanecido donde estaba, el vagón no lo hubiera alcanzado. Pero las leyes generales se adoptan para el tipo común de los hombres y ¿qué otra cosa hubiera hecho un hombre común que lo que hizo el desgraciado Medina en este caso? La cuestión no es nueva. La parte apelante hace, en su alegato, las siguientes citas:

''A una persona que sin su culpa se ve colocada en una situación de inminente peligro, no puede exigírsele el mismo grado de cuidado y circunspección que ejercería una persona prudente cuando no está frente a un peligro inmediato. Tal persona, como cuestión de derecho, no es culpable de negligencia contributoria, por el hecho de no haber actuado en la forma más juiciosa ante los distintos riesgos que corrió, o por razón de haber podido escapar si hubiera actuado de distinta manera. La cuestión en tales casos no es averiguar lo

que hubiera hecho una persona cuidadosa bajo circunstancias ordinarias o normales, sino lo que hubiera hecho o lo que se hubiera podido esperar que hiciera en presencia de tal peligro.'' (*Bailey, Personal Injuries,* Tomo II, pág. 1461, ed. 2ª.)

''De acuerdo con esta regla, ante una colisión u otro peligro inminente, los empleados que saltan de una locomotora, de un tren, o de una teresina, no son culpables de negligencia contributoria, aún demostrándose que no era necesario saltar para salvarse, o realizar cualquier otro acto para evitar la lesión. Por lo tanto, no es negligencia contributoria en tales circunstancias, el intentar escaparse en dirección contraria, o quedarse un maquinista o fogonero en la locomotora, o saltar en dirección inversa.'' (Id. id. 1463.)

''Una persona que es colocada por la negligencia de otra en un sitio de peligro inmediato, y que bajo la influencia de un gran pánico ejecuta un acto que pueda contribuir a que resulte lesionada o muerta, no puede culpársele de negligencia contributoria e impedirle una reclamación.'' (*Consolidated Traction Company* v. *Scott, 55 Am. St. Rep. 620.*)

''Un empleado que por la negligencia de su superior se ve expuesto en peligro de perder la vida, no está en la obligación de escapar, aún cuando tenga tiempo para ello, sino solamente hacer aquello que un hombre de cuidado y diligencia ordinarios habría de hacer bajo tales circunstancias.'' (*Bessemer* v. *Campbell, 77 Am. St. Rep. 18.*)

''Un empleado, ya sea menor o adulto, que sin culpa por su parte se ve colocado por su patrono en situación de peligro, no es responsable de negligencia contributoria por el hecho de no decidir rápidamente y actuar en la forma más sabia para escapar del peligro que le amenazaba.'' (*Neilson* v. *Hillside C. & I. Co., 47 Am. St. Rep. 886.*)

Quiere decir que Medina en su súbita huída ante el peligro no sólo continuó en su relación de empleado para con la demandada, sino que ni siquiera fué culpable de negligencia contributoria que pudiera ser apreciada para mitigar los daños.

3. En relación con el tercer error, estudiaremos varias cuestiones suscitadas por la parte apelada en su alegato. Se

sostiene: A, que el padre de Medina no tiene derecho a reclamar, porque existía una hija natural; B, que tampoco tiene derecho a reclamar porque no se ha demostrado que el padre dependiera del hijo, y C, que no se probó debidamente el parentesco entre el beneficiario y Medina.

A. En la contestación se alegó la existencia de una hija natural de Medina. En el acto del juicio se presentaron como prueba dos pleitos, uno de filiación seguido por Rosa Márquez a nombre de Petra Maldonado contra Antonio Medina en el que se solicitaba que se declarase a la demandante hija natural de Santiago Medina y otro instado por la misma demandante contra la aquí demandada en reclamación de daños y perjuicios sufridos por virtud de la muerte de Medina que se alegaba ser el padre natural de Petra Maldonado. Pero si bien esto es así, se demostró en el juicio que en ambos pleitos se había dictado sentencia que era firme y definitiva por desistimiento de la parte demandante.

En el caso de *American Railroad Company of Porto Rico* v. *Wolker*, 22 D. P. R. 283, invocado por la parte apelada, se trataba de dos hijas naturales reconocidas constante el reconocimiento por sentencia. Aquí no existe prueba válida alguna de que Petra Maldonado fuera hija natural reconocida de Medina.

B. Antonio Medina, entre otras cosas declaró en el juicio que Santiago Medina "era hijo suyo y de María Carmona, esposa del declarante. Que la dicha María Carmona murió. Que Santiago Medina a la hora de su muerte era soltero * * *. Que su hijo * * * ayudaba al testigo en su subsistencia dándole tres, cuatro y hasta cinco dólares semanales. Que dicho hijo vivía en la casa del declarante, en la calle de la Unión de Fajardo, en su compañía · * * *. Que después de muerto el hijo del declarante, éste se las arreglaba para vivir vendiendo algunas gallinas y animales que tenía y cogiendo fiado en casa de don Faustino Berríos,

hasta que en definitiva le costó vender la casa para poderse sostener  *  *  *.  Que el declarante tiene más hijos pero son todos mujeres.'' Esta declaración no fué contradicha y a nuestro juicio es bastante para demostrar la relación de dependencia en el caso de que tal dependencia fuera necesaria para el ejercicio de la acción.

C. Acabamos de enterarnos que Antonio Medina repetidamente declaró en el juicio, sin objeción por parte de la demandada, que Santiago era su hijo legítimo. Esa prueba, unida a la certificación del matrimonio de Antonio Medina con María Carmona, es bastante a nuestro juicio, sin que sea necesario presentar como pretende la apelada la certificación de nacimiento. de Santiago.

Habiendo llegado a las anteriores conclusiones, es necesario declarar que la corte cometió también el tercero y último de los errores señalados y que procede, por tanto, la revocación de la sentencia.

A los efectos de dictar la que debió haber dictado la corte de distrito debe tenerse en cuenta la edad del beneficiario, lo que recibía de su hijo y las condiciones personales de éste. La edad exacta del beneficiario no consta pero debe ser naturalmente avanzada. Lo que recibía de su hijo ascendía de tres a cinco dólares semanales. El hijo tenía veintitrés años al morir, era fuerte, trabajador y ganaba diez dólares semanales.

Esos son los hechos. La jurisprudencia que debe guiarnos la encontramos en el resumen de la decisión de la Corte Suprema Nacional en el caso de *Mich. Cent. R. R.* v. *Vreeland,* 227 U. S. 59. Dice así:

''Bajo la Ley Común el derecho de acción por un daño a la persona se extingue por muerte de la parte perjudicada, ya sea la muerte instantánea o no. Como la Ley de Responsabilidad de Patronos de 1908 no establecía tal sobrevivencia, el derecho quedaba extinguido por muerte.

"Bajo la Ley Común pérdidas y daños pueden devengarse, así como también un derecho de acción, a favor de las personas que dependen de otra que ha sido torticeramente lesionada; pero esta causa de acción se extingue por muerte, excepto en cuanto a la pérdida de servicios antes de la muerte.

"Sin embargo, la intención evidente del Congreso al promulgar la Ley de Responsabilidad de Patronos de 1908 fué poner a salvo un derecho de acción en favor de determinados parientes que dependan del empleado torticeramente lesionado, por la pérdida y daños pecuniarios resultantes de su muerte, y no hay limitación expresa ni implícita de la responsabilidad a los casos en que la muerte fuera instantánea.

"Esta responsabilidad es sólo por daños pecuniarios, y el estatuto debe ser interpretado en este respecto como lo fué la Ley de Lord Campbell, es decir, no como que concede una continuación del derecho que el empleado lesionado tenía, sino·que concede una nueva e independiente causa de acción.

"La pérdida pecuniaria que puede recobrarse bajo la Ley de Responsabilidad de Patronos de 1908 por uno que depende del empleado torticeramente muerto, debe ser una pérdida que pueda ser medida por alguna norma, y no incluye una pérdida incalculable tal como la de la sociedad y compañía del difunto, o la de los cuidados y consejos, tratándose de un marido, a la mujer."

En el presente caso cuatro mil dólares parecen suficientes para garantizar al beneficiario durante el resto de su vida una renta igual a la cantidad que recibía de su hijo al tiempo de la muerte. Debe dictarse una sentencia por tal suma, sin especial condenación de costas.

> *Revocada la sentencia apelada y condenada la demandada a pagar al demandante $4,000 en concepto de daños y perjuicios, sin especial condenación de costas.*

Jueces concurrentes: Sres. Asociados Wolf, Aldrey y Hutchison.